57 CCPA

### Walter MUNCH, Jr.
### v.
### Richard H. PETERSON.
### Patent Appeal No. 8228.

United States Court of Customs
and Patent Appeals.
Jan. 29, 1970.

May 16, 1958. Munch copied the count in directly involved application serial No. 4,444, filed January 25, 1960, and was made senior party upon being accorded the benefit of the filing date of his co-pending application serial No. 657,085, filed May 6, 1957. Both parties filed testimony in the form of affidavits pursuant to a stipulation,. and Peterson stated before the board that he relies only on the question of Munch's right to make, which he had previously raised unsuccessfully by his motion to dissolve the interference. The invention in issue relates to circuits for use in an electronic organ to provide signals corresponding to the different notes of the musical scale for audible reproduction through conventional means. In normal electronic organ playing, the tones cease almost simultaneously with release of the keys by the player, unless some type of sustaining equipment is employed. The invention here provides a special sustaining effect whereby the tone volume decays rapidly at first, and then decays less rapidly down to an inaudible level. The single count, separated into clauses, reads as follows:

Hurvitz & Rose, Washington, D. C., attorneys of record, for appellant; Hyman Hurvitz, Washington, D. C., of counsel.

Donald H. Sweet, Evanston, Ill., for appellee.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN and LANE, Judges, and RAO, Chief Judge, sitting by designation.

LANE, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority to Peterson as to the single count in interference No. 94,547.

The sole issue is Munch's right to make the count, the board's award of priority resting wholly on its decision that the Munch application directly involved in the interference does not support the count.

The count originated as claim 22 in Peterson reissue patent No. 25,515, granted January 21, 1964, of an original patent issued on an application filed

> In an electronic musical instrument, in combination:
>
> a series of signal sources tuned to the notes of the musical scale;
>
> > each source having a control terminal and being adapted to deliver output signal having an amplitude which is a function of the potential of said terminal;
>
> a source of D.C. activating potential;
>
> a playing key operatively connected with each control terminal and with said D.C. source, for changing the potential of said terminal from an original inactive potential to full activating potential;
>
> electrical energy storage means connected to each control terminal;
>
> and a restoring circuit connected to each control terminal for returning said terminal to inactive potential when potential from said D.C. source is withdrawn;

said restoring circuit including a decay circuit connected to each control terminal, which normally returns said terminal to inactive potential in a predetermined period of time;

and additional means connected to said decay circuit for speeding up the decay down to a predetermined intermediate potential.

A circuit representative of those providing the various signal sources in the Munich instrument is shown in Fig. 5 of his application drawings, reproduced below:

[A951]

**FIG. 5.**

The Munch circuit includes an oscillator or generator 1 operating continuously to produce a peak-to-peak voltage of between 20 and 100 volts with about equal positive and negative peaks. One terminal of the generator is connected to a common return, hereinafter designated ground, at 5 while the other terminal is connected through two neon bulbs 2 and 3 in series to an output terminal 4 which is connected through a load resistor 9 to ground. The neon bulbs 2 and 3 are described as of the NE–3 type having a firing potential of 70 volts and an extinguishing potential of 50 volts. A second resistor 6 is connected at one terminal between the two neon bulbs 2 and 3 and at the other terminal to the ungrounded terminal of a capacitor 15, the latter having its other terminal grounded at 8. A source of direct current at 150 volts potential is connected to the ungrounded terminal of the capacitor through a switch 16. Also, a resistor 17 and a neon bulb 18 are connected in series between the ungrounded terminal of the capacitor 15 and a direct current source at 75 volts.

With switch 16, which is operated by a playing key of an electronic organ, open, the alternating voltage output of the oscillator or generator 1 is insufficient to cause the neon bulb 2 to fire. The neon bulb 3 likewise will not fire and no output signal is provided at terminal 4. Closing switch 16 impresses a potential across the capacitor 15 and charges the capacitor. The resulting potential at its ungrounded terminal causes one of the neon bulbs 2 or 3 to fire depending on the polarity of the voltage of the generator 1 at the moment. When the neon bulb 3 is firing, current passes through load resistor 9 providing an output signal at 4. When the generator output reaches a sufficient negative potential, neon bulb 2 fires through resistor 6 and through the generator; the potential across neon bulb 3 drops so that the bulb is extinguished and the signal voltage at terminal 4 drops to zero. So long as the switch 16 remains closed, the bulbs 2 and 3 fire alternately with swings of the generator voltage from negative to positive and back again. The signal at the output terminal 4 will be of square pulse form having a frequency corresponding to that of the generator and having a uniform maximum amplitude.

When the key switch 16 is opened, the capacitor 15 will be charged to substantially 150 volts and the alternate firing of the bulbs 2 and 3 will continue for a while with the charge on the capacitor gradually leaking off through the bulb discharge circuits until the charge is reduced to a potential too low to continue to cause firing of the bulbs. During this period, the amplitudes of the pulses at output 4 will gradually reduce or decay, providing a decrease in the volume of the tone, as contrasted to an abrupt cessation of tone.

The function of the circuit made up of resistor 17, neon bulb 18 and the 75 volt source is to change the rate of decay of the pulses at output 4, and hence the output volume, by causing a rapid initial rate of decay followed by a period of

slower decay. This change in the decay rate provides percussive sound effects that are sometimes desired. Thus, sufficient voltage is impressed on neon bulb 18 to render it conductive while the switch 16 is closed and, after the switch is opened, the bulb remains conductive until its voltage drops below extinguishing value due to the reduction in charge on capacitor 15. During the period that the neon bulb 18 is conducting, it causes a more rapid discharge of the capacitor than would be provided by the previously mentioned discharge circuit through the elements of the signal source itself. After the neon bulb 18 is extinguished, however, the discharge of the capacitor 15 continues at the slower rate until its potential is insufficient to render the bulbs 2 and 3 conductive and the output signal at point 4 drops to zero.

Although the main issue here revolves about the last three clauses of the count as set out above, it is first necessary to consider which elements of the Munch device are necessary to constitute each signal source of the count. As one alternative, Munch takes the position, previously adopted by the examiner in denying Peterson's motion to dissolve, that his generator 1 satisfies the requirements of the source. We cannot accept that view. The signal source must have "a control terminal" connected to other recited elements in specified relationships and must "deliver [an] output signal having an amplitude which is a function of the potential of said [control] terminal." It is apparent that the generator 1, which operates with a continuous periodic output, is not disclosed as having a control terminal meeting the count requirements.

The board noted the requirements for the signal source just mentioned and concluded:

    * * * it is our opinion that the "source" must be read as including the oscillator or generator 1, the neon bulbs 2 and 3 and the resistor 6.

We agree. Although not controlling with respect to our decision, it seems to us that the load resistor 9 is also a necessary part of the signal source. As to the other elements in the first part of the count, the point between the lower terminal of resistor 6 and the ungrounded terminal of capacitor 15 constitutes the "control terminal" of the source, the 150 volt supply line is the "source of D. C. activating potential," the switch 17 is at least part of the "playing key," and capacitor 15 is the "electrical energy storage means" connected to the control terminal.

Turning to the terms of the count pertaining to the determinative issue, the board observed that some components of the signal source must additionally be relied on to satisfy the requirement for "a restoring circuit connected to each control terminal * * *." Designating this a question of double inclusion, i. e., "whether it is proper to satisfy two different requirements of an interference count by a single element or subcombination," the board referred to In re Kelley, 49 CCPA 1359, 305 F.2d 909 (1962), for guidance. It cited the conclusion in that case that:

    Automatic reliance upon a "rule against double inclusion" will lead to as many unreasonable interpretations as will automatic reliance upon a "rule allowing double inclusion." The governing consideration is not *double inclusion*, but rather is what is a reasonable construction of the language of the claims. (Court's emphasis.)

Endeavoring to apply that reasoning to the present case, the board referred to the circuit disclosed in the Peterson patent and found Munch's circuit equivalent thereto. However, it commented that "the doctrine of equivalents does not apply in interferences." It then concluded:

    Here we do not have merely a broad requirement for means provided to restore the control terminal to inactive potential. Rather, it is a specific requirement for "a restoring circuit connected to each control terminal." Further, it is required that such re-

storing circuit include a decay circuit. In our opinion this clearly expresses' an intent to limit the count to a circuit of the type specified in addition to and independent of the previously recited signal source. * * *

Peterson emphasizes a different point before us. He contends that the recitations of the "restoring circuit," the "decay circuit" which the restoring circuit is defined as including, and the "additional means" require *three* instrumentalities rather than just *two*, to which he regards the Munch circuit to be limited.

■ Viewing the count as broadly as is reasonable, as we must do where it is not ambiguous, we are satisfied that the recitation of the "restoring circuit * * * for returning said [control] terminal to inactive potential" should be interpreted as including both the "decay circuit" and the "additional means connected to said decay circuit for speeding up the decay down to a predetermined intermediate potential." Peterson admits that Munch includes the "additional means" separately from the "source" in his resistor 17, neon bulb 18 and the 75 volt supply.

However, the problem of "double inclusion" remains. On that point, the recitations of the "source" and of the "restoring circuit" including the "decay circuit" are less broad than the mere "means" expressions in *Kelley*, which expressions were there held not to amount to an improper double inclusion of elements with the claims being interpreted broadly without regard to the patent in which they originated. Thus, *Kelley* is not necessarily controlling authority for holding the count to be supported by Munch. On the other hand, the fact that Munch's circuit provides all of the functions required by the count dictates that a contrary holding not be made without considering all aids to interpretation of the count that are appropriate. We think the circumstances of the dispute here require the conclusion that the count is ambiguous with respect to the double inclusion question and warrants

recourse to the Peterson patent for interpretation. See Smith v. Wehn, 50 CCPA 1544, 318 F.2d 325 (1963).

The circuit disclosed in the Peterson patent includes signal sources for the different musical notes, each comprising an electronic oscillator which is normally inactive, but, upon application of a direct current actuating potential to a control terminal therein, delivers an output signal having an amplitude which is a function of the potential of the control terminal. A capacitor connected to the control terminal charges to activating potential after closure of a key-operated switch connecting a direct current source to the control terminal. Also connected to the control terminal side of the switch are circuit elements including a second capacitor connected at its other terminal through a resistor to the direct current activating source, and a separate resistor connected at its other terminal to ground. Additionally a circuit extends from the same side of the switch through a diode and resistor to a lead wire having a potential such that, upon opening of the switch, the circuit offers a path for rapid decay of control terminal potential until it reaches a predetermined value between the initial operative potential of the terminal and a potential insufficient to maintain the oscillation. The last circuit provides the "additional means" of the count like the circuit through the neon bulb 18 of Munch and need not be considered further.

Aside from activating the "additional means," opening of the switch in Peterson results in other elements of the described circuit also contributing to the restoration of the control terminal potential to inoperative level. First, a path through the oscillator or source circuit to ground normally tends to discharge the charged capacitor. Also, a circuit acts to charge the second capacitor in a direction to return the control terminal to inoperative potential. The latter circuit extends from the direct current supply through the associated resistor and capacitor to the control ter-

minal side of the switch and from that point through parallel paths including one through a portion of the signal source oscillator to ground and another through the aforementioned separate resistor to ground. There is no suggestion that the latter path through the separate resistor can be used alone. On the contrary, the Peterson specification states that "nearly all" of the charging current for the second capacitor "comes through the oscillator circuit" instead of through that resistor.

We therefore think it plain that the board erred in finding the recitation of the "restoring circuit" and the "decay circuit" included therein to express an intent "to limit the count to a circuit of the type specified in addition to and independent of the recited signal source." Rather, the part of the Peterson circuit that functions as "a restoring circuit * * * for returning said [control] terminal to inactive potential when potential from said D.C. source is withdrawn" and the "decay circuit * * * which normally returns said terminal to inactive potential in a predetermined period of time" clearly includes a circuit through the signal source or oscillator to ground. Even though a resistor which is not part of the signal source is also connected to the control terminal side of the switch, and other elements in addition to the source are provided, the period of time which would normally be taken for restoring the potential is primarily controlled by a path through the oscillator or signal source.

█ Thus, as Munch contends, double inclusion of elements is necessary in applying the count to the Peterson disclosure as well as to Munch's circuit. Moreover, the part of Peterson that must be included twice is, as in Munch, a portion of the signal "source." Under the particular circumstances, we think that the breadth of the count is such that a reasonable construction of it requires the conclusion that it is supported by the Munch disclosure.

Peterson asserts that, in his reissue application, he sought to obtain two claims which he regards as defining a "two-part" instrumentality for returning the control terminal to inactive potential and which he considers to be supported by Munch. We do not see that those claims, which are merely set out in the record unaccompanied by the prosecution history, demonstrate either that the present claim requires a three-part instrumentality, or that it is not reasonable to interpret the count as finding support in Munch despite any double inclusion of elements.

The decision is reversed.

Reversed.